[No. B103647. Second Dist., Div. Four. Nov. 4, 1996.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
EVON MYERS, Real Party in Interest.

## COUNSEL

Gil Garcetti, District Attorney, Brent Riggs and Fred Klink, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Michael P. Judge, Public Defender, Albert J. Menaster, Stuart Mentzer and Jack T. Weedin, Deputy Public Defenders, for Real Party in Interest.

## OPINION

**BARON, J.**—The People of the State of California filed a petition in respondent superior court to continue involuntary treatment of real party in interest Evon Myers, an alleged mentally disordered offender, pursuant to section 2970 of the Mentally Disordered Offender (MDO) Law (Pen. Code, § 2970).[1] Respondent ruled the statute constitutes an ex post facto law when applied to Myers and dismissed the petition. We issued a stay of the order and an alternative writ of mandate on the request of the People in order to determine the constitutionality of applying the extended involuntary treatment provisions of the MDO Law to paroled prisoners like Myers who committed their predicate crimes prior to passage of legislation which cured previously identified constitutional defects in the law. For the reasons set forth in this opinion, we conclude that the MDO Law's extended treatment provisions have no penal consequences when applied to mentally disordered offenders whose parole is completed. Accordingly, we grant the People's petition for writ of mandate and order respondent to proceed on the underlying petition as required by the MDO Law.

## BACKGROUND

### The Petition to Extend Treatment

On August 10, 1990, Myers was sentenced to state prison for seven years following his plea of guilty to a March 18, 1989, assault with a knife and commission of great bodily injury on Dalton Roe, and his admission that he had previously been convicted of a serious felony. At the expiration of his sentence, Myers was released on parole on condition that he accept treatment for his mental disorder through a community outpatient treatment program pursuant to section 2962. On February 13, 1996, the District Attorney of Los

---

[1] The MDO Law is codified in Penal Code sections 2960 through 2981. Unless otherwise specified, all statutory references are to the Penal Code.

Angeles County filed a petition, pursuant to section 2970, alleging that Myers's parole termination date was May 16, 1996, and that he has a severe mental disorder that either is not in remission or cannot be kept in remission if his treatment is not continued and that, by reason of his severe mental disorder, Myers represents a substantial danger of physical harm to others. On June 12, 1996, Myers's motion to dismiss the petition on the ground that the MDO Law, as applied to him, was ex post facto was granted by respondent court.

### The Mentally Disordered Offender Law

In order to protect the public from dangerously mentally disordered criminal offenders, the Legislature enacted a mandatory mental health evaluation and treatment program in the form of the MDO Law. As originally enacted, the MDO Law applied to all persons incarcerated before and after January 1, 1986, and became operative on July 1, 1986. (*People* v. *Jenkins* (1995) 35 Cal.App.4th 669, 672 [41 Cal.Rptr.2d 502].)

On October 6, 1988, the Court of Appeal in *People* v. *Gibson* (1988) 204 Cal.App.3d 1425 [252 Cal.Rptr. 56] concluded that "section 2962 has overwhelming penal attributes" and therefore constitutes part of a prisoner's "punishment for his criminal offense." (204 Cal.App.3d at p. 1432.) Accordingly, the court held that retroactive application of the mentally disordered offender provisions to persons who had committed crimes prior to the effective date of the MDO Law violated the federal and state constitutional ex post facto clauses (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9). (*People* v. *Gibson*, *supra*, at pp. 1434-1435.) The court also held that because the act did not require proof of present dangerousness, a requirement that was applicable to other similarly situated mentally ill offenders subject to involuntary commitment (see § 1026.5, subd. (b)(1); Welf. & Inst. Code, §§ 1800, 1801.5), the MDO Law violated the equal protection clauses of the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7).

In response to *Gibson*, the Legislature enacted urgency legislation effective July 27, 1989. Various sections of the MDO Law were amended to require proof that the patient "represents a substantial danger of physical harm to others" prior to commitment or recommitment to an inpatient facility or an outpatient program. (Stats. 1989, ch. 228, § 4, pp. 1255-1256.) In order to keep the mentally disordered offender program in effect, section 2980 was amended to provide that the MDO Law applies to persons who committed their crimes on and after January 1, 1986. (Stats. 1989, ch. 228, §§ 5, 8, pp. 1256, 1258.)

As it now reads, the MDO Law requires certain mentally disordered prisoners who have committed specifically identified violent crimes to submit to continued mental health treatment after their release on parole.

(§§ 2960-2981; Stats. 1985, ch. 1419, § 1, p. 5011; Stats. 1986, ch. 858, § 1, p. 2951.) All such prospective parolees (a) who are suffering from a severe mental disorder that is not in remission or cannot be kept in remission without treatment, (b) whose mental disorder was one of the causes of, or was an aggravating factor in, the commission of his or her crime, (c) who have been in treatment for 90 days or more within the year prior to his or her parole release day, and (d) who have been certified by a designated mental health professional to represent a substantial danger of physical harm to others by reason of his or her severe mental disorder, are required to be treated by the State Department of Mental Health as a condition of parole. (§ 2962, subds. (a)-(d).) The treatment must be inpatient unless the Department of Mental Health certifies to the Board of Prison Terms that it is safe to treat the parolee on an outpatient basis. Outpatient treatment can be revoked and the parolee can be placed in a secure mental health facility if the outpatient mental health director thinks the parolee cannot be safely and effectively treated in the community. (§ 2964, subd. (a).)

A parolee has the right to contest the findings of mental disorder and the decision to impose inpatient versus outpatient treatment before the Board of Prison Terms and, if dissatisfied with the results of the hearing, may petition the superior court for a hearing to determine whether he or she genuinely falls under the criteria of section 2962. (§ 2966, subds. (a) and (b).) The hearing in the superior court "shall be a civil hearing," in which the burden of proof is on the person or agency who certified the prisoner under subdivision (d) of section 2962. Both the rules of criminal discovery and civil discovery apply, trial is by jury, and a unanimous verdict of proof beyond a reasonable doubt is required. (§ 2966, subds. (a) and (b).)

If the paroled prisoner's mental disorder is put into, and can be kept in, remission during the parole period, the Department of Mental Health must discontinue treating the parolee. (§ 2968.) However, if by the conclusion of his or her parole period the parolee's severe mental disorder is not in remission or cannot be kept in remission without treatment, the extension provisions which are the subject of this petition come into play.[2] (§ 2970.)

Under these provisions, the director of the program which has been responsible for the parolee's treatment must submit a written evaluation on remission to the district attorney's office not later than 180 days prior to the termination of parole. The district attorney may then file a petition with the superior court for continued involuntary treatment for one year. The petition must be supported by affidavits specifying "that treatment, while the prisoner was released from prison on parole, has been continuously provided by

---

[2]Section 2970 also applies to severely mentally disordered prisoners who remain in prison due to their refusal to agree to treatment as a condition of parole.

the State Department of Mental Health either in a state hospital or in an outpatient program[,] . . . that the prisoner has a severe mental disorder, that the severe mental disorder is not in remission or cannot be kept in remission if the person's treatment is not continued, and that, by reason of his or her severe mental disorder, the prisoner represents a substantial danger of physical harm to others." (§ 2970.) At this point, the court is once again required to conduct a "civil" hearing on the petition for continued treatment. And, like the hearing provided at the time of the initial finding, there is a right to a jury trial, both civil and criminal discovery rules apply, representation for the People is by the district attorney, the public defender is appointed if the patient is indigent, and the jury's verdict must be unanimous and based upon proof beyond a reasonable doubt. (§ 2972, subds. (a) and (b).)

Subdivision (c) of section 2972 provides: "If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which he or she was being treated at the time the petition was filed, or committed to the State Department of Mental Health if the person was in prison. The commitment shall be for a period of one year from the date of termination of parole or a previous commitment or the scheduled date of release from prison as specified in Section 2970."

The treatment facility has an affirmative obligation to provide treatment for the underlying causes of the person's mental disorder (§ 2972, subd. (f)) and the person is considered an involuntary mental health patient who is entitled to all the rights accorded to civil committees under the Lanterman-Petris-Short (LPS) Act. (§ 2972, subd. (g); Welf. & Inst. Code, § 5325.)

A new petition may be filed each year in accordance with all the foregoing provisions so long as the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and by reason thereof, the patient still presents a substantial danger of physical harm to others. (§ 2972, subd. (d).)

*The Constitutional Prohibition on Ex Post Facto Laws*

Article I, section 10 of the United States Constitution provides: "No State shall . . . pass any . . . ex post facto law . . . ." In *Collins* v. *Youngblood*

(1990) 497 U.S. 37 [111 L.Ed.2d 30, 110 S.Ct. 2715], the Supreme Court reviewed its decisions analyzing the clause and found that expansive language had crept into its decisions which had caused considerable confusion in state and lower federal courts about the scope of the clause. (*Id.* at p. 41 [111 L.Ed.2d at p. 38].) In order to clarify its views, the court rejected statutory analyses which were phrased in terms of whether a law eliminated a "substantial protection" or "altered the situation of the accused to his disadvantage." Instead, the court returned to an analysis of the ex post facto law consistent with its understanding of that term at the time the Constitution was adopted. (*Id.* at pp. 47-52 [11 L.Ed.2d at pp. 42-45].) ▮ Under this analysis, ". . . the clause prohibits three legislative categories: legislation ' "[1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed . . . ." ' (*Collins, supra,* 497 U.S. 37, 42 [111 L.Ed.2d 30, 39, 110 S.Ct. 2715, 2719], quoting *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169 [70 L.Ed. 216, 217, 46 S.Ct. 68].). . . . [T]he ex post facto clause of the California Constitution [article I, section 9] is to be analyzed identically." (*People* v. *McVickers* (1992) 4 Cal.4th 81, 84 [13 Cal.Rptr.2d 850, 840 P.2d 955]; *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 295-297 [279 Cal.Rptr. 592, 807 P.2d 434].)

"Although the Latin phrase '*ex post facto*' literally encompasses any law passed 'after the fact,' it has long been recognized by [the high court] that the constitutional prohibition on *ex post facto* laws applies only to *penal* statutes which disadvantage the offender affected by them. [Citations.]" (*Collins* v. *Youngblood, supra,* 497 U.S. at p. 41 [111 L.Ed.2d at p. 38], third italics added.) With this background in mind, we turn to the issues presented by the petition.

DISCUSSION

I

*The People's Right to Review*

▮ We must first consider whether the People have a right to review by extraordinary writ in the instant case. Myers contends that even if respondent court's order constitutes judicial error, or is "egregiously erroneous," the People have no right to appeal, and when the People have no right to appeal, extraordinary relief is not available. (*People* v. *Superior Court* (*Stanley*) (1979) 24 Cal.3d 622, 625-626 [156 Cal.Rptr. 626, 596 P.2d 691].) Myers

points out that the People's right to appeal in *criminal* cases is limited by section 1238 to an order setting aside an indictment, information, or complaint, none of which, he argues, is applicable because the pleading here is by petition. He reminds us that "[t]he statutory restriction of the People's right to appeal in criminal cases 'is not merely a procedural limitation allocating appellate review between direct appeals and extraordinary writs but is a substantive limitation on review of trial court determinations in criminal trials.' [Citations.]" (*People* v. *Drake* (1977) 19 Cal.3d 749, 758-759 [139 Cal.Rptr. 720, 566 P.2d 622], quoting *People* v. *Superior Court* (*Howard*) (1968) 69 Cal.2d 491, 498 [72 Cal.Rptr. 330, 446 P.2d 138].)

In determining whether a particular proceeding is criminal we look to the Legislature's intent and to the purpose and effect of the statute. (See *United States* v. *Ward* (1980) 448 U.S. 242, 248 [65 L.Ed.2d 742, 749, 100 S.Ct. 2636].) Here, the Legislature has expressly provided that an MDO "hearing shall be a *civil* hearing" (§§ 2966, subd. (b), 2972, subd. (a), italics added) thereby indicating that when a petition is filed against a person it intends that the court proceed in a nonpunitive, noncriminal manner. We recognize that the civil label is not dispositive. Where a defendant provides " 'the clearest proof' " that the " 'statutory scheme [is] so punitive either in purpose or effect' " the proceeding must be considered criminal. (*Allen* v. *Illinois* (1986) 478 U.S. 364, 369 [92 L.Ed.2d 296, 304, 106 S.Ct. 2988].) As we shall explain, however, the MDO provisions are neither punitive in purpose nor effect and their procedural safeguards do not require us to transform the hearing into a criminal trial. (*Allen* v. *Illinois*, *supra*, at p. 371 [92 L.Ed.2d at pp. 305-306].)

We conclude that the proceedings are civil and that the court's order dismissing the petition was a final judgment. Accordingly, the People have the right to appeal pursuant to section 904.1, subdivision (a)(1) of the Code of Civil Procedure which provides "[a]n appeal may be taken from a superior court . . . [¶] . . . judgment . . . ."

■ We turn then to the question of whether the People have "a plain, speedy, and adequate remedy, in the ordinary course of law." If not, the writ must issue. (Code Civ. Proc., § 1086.) The People argue that they do not have "an adequate remedy [at law] in this case because the dismissal of the People's petition would result in Myers's release from all commitments and the attendant danger to the public occasioned by the removal of all structure that assures that Myers continues to take the medication that prevents him from becoming violent." Attorneys for Myers argue that such "allegation is without merit" because if Myers "does have a discernible mental disorder and if he is a danger to others," as alleged in the petition, he may be detained

under sections 5150 and 5250 of the Welfare and Institutions Code which provide for the detention and hold of a person who, "as a result of a mental disorder, is a danger to others, or to himself or herself, or gravely disabled[.]" (Welf. & Inst. Code, § 5150.) Thereafter, the People may seek "further treatment" by referral for and the establishment of a conservatorship under Welfare and Institutions Code sections 5270.55 and 5350 et seq.

However, as the People point out, Welfare and Institutions Code section 5150 provides for the detention for evaluation of persons with mental disorders for a period not to exceed 72 hours, and Welfare and Institutions Code section 5250 provides that a person detained pursuant to section 5150 can be certified for an additional period, not to exceed 14 days for intensive treatment. Welfare and Institutions Code section 5350 allows for the appointment of a conservator for "gravely disabled" persons, i.e., those who, as a result of mental illness, cannot provide their own food, shelter, or clothing. (Welf. & Inst. Code, § 5008, subd. (h)(1).) There is no evidence that Myers is "gravely disabled" under the definitions in Welfare and Institutions Code sections 5350, subdivision (e)(1) or 5008, subdivision (h)(1). Accordingly, we conclude that the People do not have an adequate remedy at law within the meaning of Code of Civil Procedure section 1086, and are faced with a potentially dangerous individual who allegedly needs treatment. "[B]ecause the public has a clear interest in seeing its legislative purposes properly implemented, we find that the present petition presents a question of substantial right warranting mandamus review." (*People* v. *Superior Court* (*John D.*) (1979) 95 Cal.App.3d 380, 387 [157 Cal.Rptr. 157].)

## II

*The Mentally Disordered Offender*
*Law Is Not a Penal Statute*

Respondent dismissed the petition to extend Myers's involuntary treatment on the ground that the MDO Law has been held to be "penal in nature" and therefore is ex post facto as applied to Myers in that Myers committed his crime after *Gibson* declared the law unconstitutional and before the date the urgency legislation curing the constitutional deficiencies went into effect.

In his return to the petition filed herein, Myers acknowledges that *Collins* v. *Youngblood, supra,* 497 U.S. 37, and *People* v. *McVickers, supra,* 4 Cal.4th 81, redefined the principles previously governing ex post facto analysis by deleting the " 'substantial disadvantage [to] the offender' prong"

—one of the grounds used by *Gibson* for its finding that the MDO Law violated the ex post facto clauses. Myers argues that is irrelevant because "[u]nder *Collins*, a statute remains ex post facto in its application if it changes the punishment or inflicts greater punishment than the law annexed to the crime when it was committed" and "[u]nder *McVickers*, a statute also remains *ex post facto* in its application which makes more burdensome the punishment for a crime, after its commission."

Myers's theory is that *Gibson* relied only in part on the substantial disadvantage prong. He contends the penal attributes of the MDO statutory scheme as amended still change or inflict greater punishment and make the punishment for a crime more burdensome under the *Collins* and *McVickers* tests. Therefore, in Myers's view, the outcome of *Gibson* would be unaffected by either the *Collins* or *McVickers* decisions.

In support of this contention, Myers points out that since *Gibson* decided that the MDO statutes have "overwhelming penal attributes," five decisions have been published affirming the "penal" nature of the MDO Law, all decided after the amendments curing the equal protection defect took effect. (See *People* v. *Pretzer* (1992) 9 Cal.App.4th 1078, 1085 [11 Cal.Rptr.2d 860] [Fifth Amendment permits prosecutor to call MDO as witness at hearing to answer questions concerning his present mental competence but forbids questions relating to predicate crime]; *People* v. *Collins* (1992) 10 Cal.App.4th 690, 694 [12 Cal.Rptr.2d 768] [jury instructions regarding the consequences of a verdict of mental illness and defining "force and violence" held prejudicial]; *People* v. *Coronado* (1994) 28 Cal.App.4th 1402, 1406 [33 Cal.Rptr.2d 835] [evidence sufficient to support MDO determination and People not foreclosed from seeking an MDO determination after reincarceration on parole where parole is again imminent and mental status has changed]; *People* v. *Jenkins, supra,* 35 Cal.App.4th at p. 674 [MDO statute not ex post facto as applied to offender whose February 21, 1986, offense was committed over one month after statute's effective date but five months before statute's operative date]; and *People* v. *Superior Court (Jump)* (1995) 40 Cal.App.4th 9, 12 [46 Cal.Rptr.2d 829], review den. Feb. 15, 1996 [proper court in which to initiate petition for continued involuntary treatment is superior court located in county in which inmate is convicted of crime that serves as foundation for his placement in state hospital as a MDO].)

The People contend each of the foregoing cases "relies upon *Gibson* without further analysis or discussion" and that "subsequent changes in the law have undermined the rationale of *Gibson* to the extent that *Gibson* is no longer good authority for the proposition that [the] MDO [Law] is an ex post facto law." ■ The People argue that a careful analysis of the MDO Law

reveals that the law is concerned with two objectives, neither of which is penal: "(1) protection of the public, and (2) treating persons who have committed crimes who have severe mental disorders."

We agree with the People. The cases cited by Myers only tangentially touch on the issue presented here. In none of the cases was there an analysis of the amended MDO Law in light of the United States Supreme Court's clarification of ex post facto principles. The *Gibson* decision itself was based on the faulty premise that the "mentally disordered offender provisions (MDO) of section 2962 et seq. both increase punishment and alter the situation of the accused to his disadvantage" (*People* v. *Gibson, supra,* 204 Cal.App.3d at p. 1431) when in fact it does neither. The purpose of the MDO statutory scheme is to provide *mental health treatment* for those offenders who are suffering from *presently severe mental illness,* not to punish them for their past offenses. Subdivision (c) of section 2972 specifically requires a jury finding "that the patient has a severe mental disorder,[3] that the patient's severe mental disorder is not in remission or cannot be kept in remission[4] without treatment,[5] and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others. . . ."

Laws which impose involuntary treatment upon people who suffer from present mental illnesses which cause them to be dangerous are not penal merely because the class of people subject to the laws are accused of, or have been convicted of, a crime. This was made clear in *Conservatorship of Hofferber* (1980) 28 Cal.3d 161 [167 Cal.Rptr. 854, 616 P.2d 836]. There, our Supreme Court held that the 1974 amendments to the LPS Act providing

---

[3]"The term 'severe mental disorder' means an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely. The term 'severe mental disorder' as used in this section does not include a personality or adjustment disorder, epilepsy, mental retardation or other developmental disabilities, or addiction to or abuse of intoxicating substances." (§ 2962, subd. (a).)

[4]"The term 'remission' means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support." (§ 2962, subd. (a).)

[5]"A person 'cannot be kept in remission without treatment' if during the year prior to the question being before the Board of Prison Terms or a trial court, he or she has been in remission and he or she has been physically violent, except in self-defense, or he or she has made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family, or he or she has intentionally caused property damage, or he or she has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard shall be whether the person has acted as a reasonable person would in following the treatment plan." (§ 2962, subd. (a).)

for a civil conservatorship of a defendant found incompetent to stand trial did not violate constitutional limitations on retroactive and ex post facto laws, even though the crime of which he was accused occurred before the amendments became effective. This was because the act's "provisions . . . have nothing to do with any punitive disability attached to the homicide charged against appellant at the time it occurred. They did not alter or affect the sentence for that crime. They did not extend, directly or indirectly, any incarceration that had been or could be imposed on appellant for criminal conduct. . . . [A]ppellant's confinement arose not from criminal conduct but from his mental condition. He does not face incarceration in a prison but must be placed in a state hospital or some other less restrictive setting. [Citation.]" (*Conservatorship of Hofferber, supra,* at pp. 181-182, fn. omitted.) The court was not dissuaded from this holding even though it "recognize[d] that LPS Act conservatees often are confined at Patton and Atascadero State Hospitals, prisonlike institutions that also house MDSO's convicted of crime. [Citations.]" (*Id.* at p. 182, fn. 18.) "Statutes that focus on a *continuing dangerous condition . . .* are not retroactive simply because they employ pre-statute conduct as evidence of the ongoing dangerousness. [Citations.]" (*Id.* at p. 182, original italics.)

In *Allen* v. *Illinois, supra,* 478 U.S. 364, the United States Supreme Court similarly held that proceedings under the Illinois Sexually Dangerous Persons Act are not "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination. The court rationalized that since the act's aim was to provide treatment, not punishment, for persons adjudged sexually dangerous, the act was not an ex post facto law. In reaching this conclusion, the court was swayed by the act's requirement that the state prove more than the commission of a criminal act. Under the act, the state was obligated to prove the existence of a mental disorder lasting for more than one year and a propensity to commit criminal acts through something more than the prior commission of such acts. On the other hand, the fact that the state could not file a sexually-dangerous-person petition under the act unless it had already filed criminal charges against the defendant—which meant the act did not apply to the larger class of mentally ill persons who might be found sexually dangerous—did not change the civil proceeding into a criminal one. In addition, the availability of some of the safeguards applicable in criminal proceedings—rights to counsel, to a jury trial, and to confront and cross-examine witnesses, and the requirement that sexual dangerousness be proved beyond a reasonable doubt—did not turn the proceedings under the act into criminal proceedings requiring the full panoply of rights applicable there. And the fact that a person adjudged sexually dangerous under the act is committed to a maximum-security institution that also houses convicts needing psychiatric care did not transform the conditions of that person's confinement into "punishment" and thus render "criminal" the proceedings that led to confinement.

Three years earlier, in *Jones* v. *United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043], the Supreme Court dealt with the question of whether the due process clause was violated in the case of a not guilty by reason of insanity (NGI) acquittee because he had been hospitalized for a period longer than he could have been incarcerated if convicted. In holding it was not, the court ruled: "The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." (*Id.* at p. 368 [77 L.Ed.2d at p. 708].)

In the same vein, our Supreme Court in *McVickers* cited with approval a Connecticut case, *Payne* v. *Fairfield Hills Hosp.* (1990) 215 Conn. 675, 683 [578 A.2d 1025, 1029], which held that "confinement of a person acquitted of a crime because of insanity is generally not punishment in the ex post facto context because its purposes are treatment for the individual and protection of society." (*People* v. *McVickers, supra,* 4 Cal.4th at p. 87.)

Our state appellate courts also have addressed the issue of whether the ex post facto clause was violated as applied to NGI committees. In *People* v. *Buttes* (1982) 134 Cal.App.3d 116, 128 [184 Cal.Rptr. 497], the appellant was committed in 1975 and it was not until January 1, 1980, that he was subject to a two-year extended commitment. Prior to that, the appellant was subject to only a one-year extended commitment. Appellant's argument that the law was ex post facto was "grounded upon the erroneous assumption that the original insanity commitment was a penal commitment." (*Ibid.*) According to the court, "[t]he law is to the contrary. [Citations.] [¶] Neither the original commitment nor the extension was criminal punishment but was for treatment in a state hospital." (*Ibid.*; see also *People* v. *Juarez* (1986) 184 Cal.App.3d 570 [229 Cal.Rptr. 145] [application of new definitional criteria for offense-related predicate for extended commitment of NGI was not ex post facto, as recommitment procedures could not disadvantage the defendant in the determination of his criminal guilt]; *People* v. *Superior Court (Woods)* (1990) 219 Cal.App.3d 614, 617 [268 Cal.Rptr. 379] ["Retroactive changes in the law which result in increased terms of commitment for NGI defendants are not considered ex post facto because the commitments are not penal but for treatment purposes. [Citations.]"].)

Furthermore, that the purpose of the MDO Law is "to protect the public" does not turn its provisions into punishment despite what *Gibson* may state to the contrary. (*People* v. *Gibson, supra,* 204 Cal.App.3d at p. 1433.) As noted previously, *McVickers, Hofferber,* and *Jones* each upheld the constitutionality of laws enacted with the protection of society in mind. (See also *Addington* v. *Texas* (1979) 441 U.S. 418, 426 [60 L.Ed.2d 323, 331, 99 S.Ct.

1804] [state has "authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill."].)

Finally, Myers argues that, because the MDO Law did not require a finding of present dangerousness as a prerequisite to imposing treatment until its amendment on July 27, 1989, the law may not be applied to those mentally disordered offenders who committed their predicate crime prior to that date without also violating the due process clauses of the United States and California Constitutions. In support of this contention, Myers relies on cases which analyzed the retroactive applicability of substantial changes in criminal laws effected by judicial decisions overruling previous case law. (*People* v. *King* (1993) 5 Cal.4th 59, 70-81 [19 Cal.Rptr.2d 233, 851 P.2d 27] [overruling limitation on consecutive enhancements under section 12022.5]; *In re Baert* (1988) 205 Cal.App.3d 514, 518-519 [252 Cal.Rptr. 418] [eliminating proof of intent to kill as an element of the felony-murder special circumstance]; *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 353 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697] [judicial expansion of South Carolina's criminal trespass law].) These cases are inapplicable as they are based upon " 'the notion that persons have a right to fair warning of that conduct which will give rise to *criminal penalties* . . . .' [Citations.]" (*In re Baert, supra*, 205 Cal.App.3d at p. 518, italics added.)

We find the analysis of the urgency amendments to the LPS Act in *Hofferber* more analogous to the amendments to the MDO Law. There, in language equally applicable to mentally disordered offenders, it was stated: "We have held that a legislative attempt to cure an unconstitutional statute may suggest an intent that the curative provision be applied retroactively. [Citations.] Moreover, the 1974 amendments [to the LPS Act] seek to protect against a particular class of *potentially* dangerous persons. In such cases, legislative expressions of urgency in the interest of public safety necessarily indicate an attempt to reach all persons in the class who represent the continuing danger even if they fall within the legislative purview partly by reason of prior conduct. [Citation.] [¶] . . . [D]angerous mentally ill persons gain *no* perpetual 'vested right' in the commitment scheme extant when their illnesses first came to public attention. To say that they have 'reasonably relied' on that scheme in displaying their dangerous conditions is to indulge a patent fiction. Such a rule would severely hamper legislative efforts to respond to new knowledge about mental illness, correct perceived deficiencies in the statutory scheme, and refine the state's machinery for treatment and restraint of dangerously disturbed people. [Citation.]" (*Conservatorship of Hofferber, supra*, 28 Cal.3d at pp.183-184, fns. omitted.)

In sum, section 2970 does not subject a mentally disordered offender to any punitive ramifications. A refusal to comply with treatment cannot lead to

denial of parole or reincarceration in state prison. Its provisions do not provide for the extension of the MDO's parole. MDO's subject to its provisions are not under the supervision of a parole officer or the Board of Prison Terms. The law does not punish as a crime an act previously committed, which was innocent when done. It imposes no punishment for a crime after its commission and it does not deprive an MDO of any defense available at the time his or her criminal act was committed. Laws which require treatment for people who are currently mentally ill and who are gravely disabled or dangerous to others (or themselves for that matter) are not punitive and therefore such laws do not violate the ex post facto clauses.[6]

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order of June 12, 1996, which granted real party in interest Myers's motion to dismiss the People's petition for extended commitment, and to make a new and different order denying Myers's motion and reinstating proceedings on the People's petition for involuntary treatment pursuant to section 2970. It is further ordered that the temporary stay issued herein on August 12, 1996, shall remain in effect until respondent complies with our direction.

To facilitate the relief requested, this opinion is final forthwith. (Cal. Rules of Court, rule 24(d).)

Epstein, Acting P. J., and Hastings, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied January 22, 1997.

---

[6]We note that in two recent decisions, the 1995 Sexually Violent Predators Act (Welf. & Inst. Code, div. 6, pt. 2, ch. 2, art. 4, § 6600 et seq.) which mandates confinement and treatment for sexually violent predators who committed their crimes prior to 1995 and who are about to complete their prison sentences also was held not to be an ex post facto law. (*People* v. *Superior Court* (*Cain*) (1996) 49 Cal.App.4th 1164 [57 Cal.Rptr.2d 296] review granted Feb. 5, 1997 (S057272); *Garcetti* v. *Superior Court* (1996) 49 Cal.App.4th 1533 [57 Cal.Rptr.2d 420] review granted Feb. 5, 1997 (S057336).) While these decisions are in accord with our holding, we do not rely upon them in reaching our decision as they are not yet final. (Cal. Rules of Court, rule 24(a).)